# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

UNITED STATES OF AMERICA,

v.

NICHOLAS CALABRESE, *et al.*

No. 02 CR 1050 - 2, 3,4,10

Judge James B. Zagel

## MEMORANDUM OPINION AND ORDER

On September 10, 2007, the jury in this case returned guilty verdicts as to James Marcello (counts 1, 2, 3, and 8); Joseph Lombardo (counts 1 and 9); Frank Calabrese, Sr. (counts 1, 4, and 5); Paul Schiro (count 1); and Anthony Doyle (count 1). Then, on September 27, 2007—after deliberating a second time—the jury returned special verdicts on whether the Government had proven the murder allegations charged as part of the racketeering conspiracy. The jury reached a unanimous decision regarding ten of the murders charged, but deadlocked as to the remaining eight.

Thereafter, Messrs. Lombardo, Calabrese, Sr., Marcello, Schiro and Doyle (collectively, "Defendants") filed post-trial motions seeking a judgment of acquittal or, in the alternative, a new trial.[1]  For the reasons that follow, those motions are denied.

## I.      MOTIONS FOR ACQUITTAL DUE TO INSUFFICIENCY OF THE EVIDENCE

Defendants have all moved for judgment of acquittal due to insufficiency of the evidence. Rule 29(c) of the Federal Rules of Criminal Procedure governs motions for judgment of acquittal made following a jury verdict.  A motion for judgment of acquittal should be granted only where

---

[1]The motions became fully briefed on August 15, 2008.

there is insufficient evidence to sustain the conviction. *United States v. Galati*, 230 F.3d 254, 258 (7th Cir. 2000); *United States v. Jones*, 222 F.3d 349, 351-52 (7th Cir. 2000).

In considering the sufficiency of the evidence, I view the evidence in the light most favorable to the Government and overturn a conviction only "if the record contains no evidence on which a rational jury could have returned a guilty verdict." *United States v. O'Hara*, 301 F.3d 563, 569-70 (7th Cir. 2002); *accord United States v. Duprey*, 895 F.2d 303, 310 (7th Cir. 1989) (evidence and inferences are viewed in the light most favorable to the government). Additionally, when considering these motions, I will neither re-weigh the evidence nor judge the credibility of the witnesses. "As long as there is a reasonable basis in the record for the jury's verdict, it must stand." *Galati*, 230 F.3d at 258 (citations omitted).

I am denying the motions for judgment of acquittal because there was ample evidence to support the jury's verdict. The jury heard from a number of Government witnesses (Nicholas Calabrese, Frank Calabrese, Jr., William "Red" Wemmette, Ronald Seifert, Emma Seifert, Alva Johnson Rodgers, James Stolfe, Frank Giudice, Anne Spilotro, Richard Clearly, Salvatore Romano, etc.). In addition, the jury heard a great many recordings, including some of the Defendants themselves. Finally, three of the five defendants took the witness stand. The jury was well within its right to believe the testimony of the Government witnesses; believe (and draw inferences from) what it heard on the recordings; and disbelieve some, much, or all of the testimony of the testifying Defendants. In light of the current procedural posture (where I am to

treat the Government's evidence as veritable Gospel), it is quite clear that there was sufficient evidence upon which the jury could reasonably return a verdict of guilty against Defendants.[2]

It is possible that some of the witnesses may have been shaky in part. It is also possible that some of the witnesses were simply wrong about some details. This, however, does not necessarily discredit their testimony in whole. The maxim "*Falsus In Uno, Falsus In Omnibus*," while often a guidepost for lawyers, is profoundly misleading. While the maxim may make some sense when "*Falsus*" means perjurious, even witnesses who deliberately lie about some things (e.g., that they acted unwillingly), may well be truthful about other things (e.g., what they did).

In addition, false testimony includes good faith mistakes and understandable slips of memory that do not necessarily discredit the witness's testimony in whole. Further, a great deal of the persuasive evidence in this case came from the mouths of the defendants themselves (either from the witness stand, or from recordings, or both). One of the defendants testified on the witness stand that his statements on the tapes were lies. The jury was within its rights to judge the statements from the defendants. In the case of the defendant who testified that his recorded statements were lies, the jury was perfectly within its rights to find that the statements from the witness stand—as opposed to those from the recordings—were a lie.

---

[2]Mr. Lombardo argues that he is entitled to entry of judgment of acquittal because of his withdrawal defense. There was evidence of Mr. Lombardo's continuing participation as a member in the proved conspiracy. Despite Mr. Lombardo's testimony that he did withdraw, a jury was entitled to find beyond a reasonable doubt that he never withdrew. His demeanor on the witness stand and his unconvincing explanations for his actions would justify a jury's determination that his testimony should be added to the pile of evidence against him. Indeed, a jury might conclude that the advertisement he placed in the newspaper, particularly when considered alongside his colorful testimony, was nothing more than a stunt.

Because Defendants fail to satisfy the standards set forth in Federal Rule of Criminal Procedure 29, their motions for a judgment of acquittal are denied.

## II.     MOTIONS FOR A NEW TRIAL

Defendants point to various supposed errors that they argue, individually or collectively, warrant a new trial. Motions for a new trial are considered under Federal Rule of Criminal Procedure 33. "A defendant is entitled to a new trial if there is a reasonable possibility that a trial error had a prejudicial effect upon the jury's verdict." *United States v. Van Eyl*, 468 F.3d 428, 436 (7th Cir. 2006) (*citing United States v. Berry*, 92 F.3d 597, 600 (7th Cir. 1996)). The Seventh Circuit has warned that when considering a motion for new trial, "Courts are to grant them sparingly and with caution, doing so only in those really 'exceptional cases.'" *United States v. Washington*, 184 F.3d 653, 657 (7th Cir. 1999); *accord United States v. DePriest*, 6 F.3d 1201, 1216 (7th Cir. 1993) (explaining that motions for new trial must be approached with great caution and that judges should be wary of second-guessing determinations made by juries).

I will address Defendants' various arguments in turn.

### A.     *Admission of Purported Hearsay and "Double Hearsay"*

Several Defendants insist that they were unfairly prejudiced by the admission of hearsay. They also argue that I erred by admitting so-called "double hearsay."

The Government sought to introduce coconspirator statements as part of its evidence against Defendants. The Federal Rules of Evidence permit this. *See* Fed. R. Evid. 801(d)(2)(E) (defining statements made "by a coconspirator of a party during the course and in furtherance of the conspiracy" as not hearsay). Thus, the Government submitted a pre-trial proffer pursuant to *United States v. Santiago*, 582 F.2d 1128 (7th Cir. 1978), *overruled on other grounds by*

*Bourjaily v. United States*, 483 U.S. 171 (1987). On May 11, 2007, I overruled Messrs.

Lombardo and Marcello's objections to the Government's *Santiago* proffer. *See* Docket #513. I

thereby concluded that the Government had proven "by a preponderance of the evidence . . . that

(1) a conspiracy existed, (2) the defendant and the declarant were members of the conspiracy, and

(3) the statement(s) sought to be admitted were made during and in furtherance of the

conspiracy." *United States v. Rodriguez*, 975 F.2d 404, 406 (7th Cir. 1992).

      Consistent with my May 11 ruling, I permitted the Government to offer a number of

statements that, but for Rule 801(d)(2)(E), might otherwise have been hearsay. Further, I am

satisfied that the Government's evidence at trial sufficiently tracked what was set forth in the

*Santiago* proffer. In their pre-trial objections to the *Santiago* proffer, and again in these post-trial

motions, some of the defendants referred to some of the statements offered as gossip or idle

chatter. I reject these characterizations. Moreover, "[e]ven if the jury was exposed to evidence

that was not properly before it . . ., a defendant is not automatically entitled to relief." *United*

*States v. Garcia*, 528 F.3d 481, 485 (7th Cir. 2008) (*quoting United States v. Gonzalez*, 319 F.3d

291, 297 (7th Cir.2003)). I should only order a new trial if "there is a reasonable possibility that

the evidence had a prejudicial effect—that is, where the error is not harmless." *Id.* Assuming,

*arguendo*, that I improperly permitted certain statements (an assumption I reject), I decline to

find that such statements amounted to sufficient prejudice such that a new trial is warranted.

      I also reject the objections to so-called "double hearsay." Rule 805 of the Federal Rules

of Evidence covers "double hearsay." The rule states: "Hearsay included within hearsay is not

excluded under the hearsay rule if each part or the combined statement conforms with an

exception to the hearsay rule provided in these rules." Fed. R. Evid. 805.

Under the rule, in order for "double hearsay" to be admitted, "each statement in the chain must fit 'an exception,' and this term should be read also to reach statements that qualify as 'not hearsay' under Fed. R. Evid. 801(d) and statements offered for nonhearsay purposes." Christopher B. Mueller & Laird C. Kirkpatrick, *Federal Evidence* § 8.136 (3d ed. 2007).

The key exception[3] in this matter is the above-referenced co-conspirator exception. *See* Fed. R. Evid. 801(d)(2)(E). The Seventh Circuit has confirmed that the co-conspirator exception can be used to admit both links in a double hearsay chain. In a 1973 case, the court considered the admissibility of testimony of a witness who testified as to what one defendant told him that a second defendant had said. *United States v. Cogwell*, 486 F.2d 823 (7th Cir. 1973). The panel stated: "it is well-settled that where a witness testifies that one coconspirator related the statement of a second coconspirator and both statements were made in the course of and in furtherance of the conspiracy, the evidence of the out-of-court statement by the second coconspirator (as well as that of the first coconspirator) is fully admissible against the second coconspirator and his fellow coconspirators." *Cogwell*, 486 F.2d at 832 n.5 (*citing United States v. Aloisio*, 440 F.2d 705, 708-709 (7th Cir. 1971); *United States v. Santos*, 385 F.2d 43 (7th Cir. 1967)).

The Seventh Circuit again addressed this issue in a 1995 case. *See United States v. Sturman*, 49 F.3d 1275 (7th Cir. 1995). In *Sturman*, the defendant objected to the admission, through A, of instructions that he (the defendant) gave to B. 49 F.3d at 1280. The panel held that such statements were admissible as a statement of a party opponent. *Id.* The court stated:

---

[3]While I refer to this as an "exception," it is actually nonhearsay. *See* Fed. R. Evid. 801(d); *United States v. Jenkins*, 419 F.3d 614, 618 (7th Cir. 2005) (holding that statements by coconspirators, "by definition, are not hearsay.").

had [B] testified as to what [the defendant] told him, it would have been admissible. The next layer of statements, [B's] relaying to [A] what [the defendant] told him to do, is admissible because as a statement of a co-conspirator, it is not hearsay. Anything said by one conspirator within the scope of the conspiracy is attributed to the other conspirators.

*Id.*

Other Circuits have reached the same conclusion. In *United States v. Sharpe*, 193 F.3d 852, 869 (5th Cir. 1999), the Fifth Circuit held that a district court properly admitted co-conspirator A's testimony that co-conspirator B called co-conspirator C to ask about a murder, and co-coconspirator C confirmed committing the murder. 193 F.3d at 869. The court found the testimony admissible because "both [C's] statements to [B] and [B's] statements to [A] were admissible as statements of co-conspirators made in furtherance of the conspiracy." *Id.*; *see also United States v. Diaz*, 248 F.3d 1065, 1087 (11th Cir. 2001) (holding that since the court determined that the 801(d)(2)(E) elements were satisfied, "[co-conspirator A] was not precluded from testifying about what [co-conspirator B] told him regarding a conversation with [co-coconspirator C].").

The *Cogwell* and *Sturman* cases, as well as the cases from other circuits, confirm that the co-conspirator exception can be used to admit both layers in a "double hearsay" situation. The objections that some of the defendants made do not warrant a new trial.[4]

B. Severance

Defendants argue that I should have granted their respective motions for severance. A court may order separate trials on separate counts if the joinder of offenses in an indictment

---

[4]Mr. Schiro also argues that I erred by admitting "speculative" testimony. I overruled Mr. Schiro's objections at trial, and I adhere to those rulings.

appears to prejudice the defendant. Fed. R. Crim. P. 14(a). "[A] district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States*, 506 U.S. 534, 539 (1993). Defendants must do more than simply show that they would have preferred separate trials or that separate trials may have given them a better chance of acquittal. *United States v. Rice*, 520 F.3d 811, 817 (7th Cir. 2008) (*citing United States v. Quilling*, 261 F.3d 707, 715 (7th Cir. 2001)).

I am confident that the jury was able to give Defendants separate consideration. First, I instructed the jurors, both at the outset of the trial, and when I formally instructed them following the close of the evidence, that they were to give each defendant separate consideration. I presume the jury followed my instruction. *See United States v. Corley*, 519 F.3d 716, 728 (7th Cir. 2008); *United States v. Serfling*, 504 F.3d 672, 677 (7th Cir. 2007).

Second, counsel for Defendants repeatedly implored the jurors to remember that they should give Defendants separate consideration.

And third, Defendants differentiated themselves throughout the trial. Defendants all sat at different tables and were all represented by separate counsel. Three of the five defendants (Messrs. Lombardo, Calabrese, Sr., and Doyle) each testified in very different ways. Several of the defendants complain that they were prejudiced by the conduct of one or more of the other defendants. The very conduct about which some of the defendants complain actually served to distinguish Defendants from one another.

One indication that the jurors were able to differentiate among Defendants is the mixed verdicts in the second phase of the trial. The jurors did not unanimously find that Defendants

had committed all of the murders that the Government was charging. The jury demonstrated the ability to weigh the evidence defendant by defendant, alleged murder by alleged murder. The verdicts in the second phase bolster my finding that the jury was able to, and in fact did, provide separate consideration to each defendant. Accordingly, Defendants' motions for a new trial because I declined to grant their severance motions are denied.

### C.     Defendant Calabrese, Sr.'s Threat

In an argument that is related to severance, defendants Lombardo, Marcello, Schiro and Doyle (collectively, "Co-Defendants") argue that they are entitled to a new trial because defendant Frank Calabrese, Sr. threatened Assistant United States Attorney (AUSA) Markus Funk during Mr. Funk's closing argument.[5]

On October 18, 2007, the United States Attorney's Office sent a letter to counsel for Frank Calabrese, Sr. and copied this Court and the attorneys for Messrs. Marcello, Doyle, Schiro, and Lombardo. The letter informed Mr. Calabrese, Sr.'s attorney that, after both phases of the trial had concluded, members of the prosecution team met with one of the anonymous jurors in this matter. The letter stated that the juror contacted the prosecution team seeking a meeting. The letter goes on to state that, at the meeting, the Juror informed AUSA Mars and AUSA Funk that, during one of the closing arguments, the juror observed Mr. Calabrese, Sr. say in Mr. Funk's direction "you are a fucking dead man." The juror stated that he was able to make out what Mr. Calabrese, Sr. was saying, in part, because he heard Mr. Calabrese, Sr., and in part by reading his lips.

---

[5]I have already concluded that Mr. Calabrese, Sr. is not entitled to any relief as a result of the threat. *United States v. Calabrese*, No. 02 CR 1050, 2008 WL 1722137 (N.D. Ill. April 10, 2008).

After receiving the letter, Defendant Joseph Lombardo moved for a hearing regarding this matter. Other Defendants referenced the letter in post trial motions as well. After the Government's initial response to Mr. Lombardo's motion, Mr. Schiro submitted a brief in which he sought a hearing. Then, after the Government's second brief on the matter, Mr. Calabrese, Sr. also filed a submission seeking a hearing.

I granted Defendants' motions in part and scheduled a hearing. After the hearing, I concluded that "the Juror did observe Mr. Calabrese, Sr. say 'you are a fucking dead man' in AUSA Funk's direction while Mr. Funk was delivering his closing argument." *United States v. Calabrese*, No. 02 CR 1050, 2008 WL 1722137, at *1 (N.D. Ill. April 10, 2008). In my post-hearing opinion, I only dealt with Frank Calabrese, Sr.'s motion for relief; I put off for another day consideration of the Co-Defendants' requests for relief. *Id.* at 3. I consider those requests here.

Though I concluded that the juror did observe Mr. Calabrese, Sr. utter a threatening remark to Mr. Funk, I nevertheless decline to grant any relief to the Co-Defendants on the basis thereof. Co-Defendants argue that his behavior was so outrageous that he deprived them of their right to receive a fair trial and verdict based solely on the evidence. I disagree.

The Co-Defendants rely principally on *United States v. Mannie*, 509 F.3d 851 (7th Cir. 2007). In *Mannie*, two co-defendants were tried together on drug and gun charges. *Mannie*, 509 F.3d at 853. One of the co-defendants, Aaron Patterson, engaged in a melange of disruptive behaviors throughout the joint trial. Judge Flaum, writing for the panel in *Mannie*, catalogued the events that occurred during that trial:

> - On July 15, one juror identified "unsavory" individuals in the gallery who were staring down members of the jury.

10

- The court conducted a voir dire of this juror who expressed that this would not affect his impartiality, and that he was mostly speculating and did not truly think that he or any juror perceived there to be a serious problem.

- On July 20, at least one juror witnessed what some of them believed to be gang members making gang signs with Mannie. Some jurors noticed members of the gallery staring at them in order to memorize their faces.

- The court conducted a voir dire of the jury. One juror noticed the gang signs between Mannie and a spectator, and expressed that she did not "want people coming to [her] home in the middle of the night to kill [her]." She also declared that "many of us don't want to be here . . . [w]e don't want to be involved for safety reasons." This juror was dismissed. The rest of the jury gave equivocating responses with respect to how they felt about the gallery, but nevertheless maintained that they could remain impartial.

- On July 21, Patterson gestured at the jury. In addition, a juror (and a court security officer) noticed a member of the gallery staring at the jury.

- This individual was eventually barred from the building, and the court reminded the jurors that if they had any concerns at any time, they should raise it with the court.

- On July 25, the courtroom drama escalated to a new level. While Mannie's counsel was cross-examining a government witness, Patterson interrupted and yelled at counsel to "get off [his] case" and accused the defense attorneys of setting him up for a fall. He then stood up, knocked one of his attorneys to the ground, grabbed the other attorney by his necktie, and threw him to the ground as well. Both attorneys were in a tangle in the corner and one limped around afterwards.

- At this point Mannie moved for a mistrial or severance. The court then conducted a voir dire of each juror individually. One juror acknowledged that she was "human" but "hoped" that she could be fair. This juror was dismissed. The rest of the jury expressed an awareness of the extreme nature of these actions, but indicated that they could still remain impartial. The court then denied Mannie's motion for a mistrial and severance.

- The next day the government motioned to bar Patterson from returning to the courtroom for his own testimony and instead testify via video feed (which the court had already set up). The district court eventually denied this motion.

- On July 26, the gallery became vocal during Mannie's testimony.

- On July 27, Patterson refused to answer questions during cross-examination and instead invoked conspiracy theories and referred to the proceedings as a legal lynching.

- Mannie moved for a mistrial. The court denied the motion almost immediately without polling the jury. Instead, it instructed the jury to disregard Patterson's conduct and testimony.

*Mannie*, 509 F.3d at 854-56.

The situation that exists in this case simply fails to rise to the level of what went on in *Mannie*. As Judge Flaum pointed out, *Mannie* was a "truly rare" case. 509 F.3d at 857. Moreover, "an individual is entitled to a fair trial-not a perfect one." *Id.* While not excusing Mr. Calabrese, Sr.'s conduct, there is a stark asymmetry between what went on in *Mannie* and what transpired during the proceedings here. There was a litany of outrageous incidents in *Mannie*, by contrast, there is really one remark at issue here. The incidents in *Mannie* took over the proceedings there, whereas here, neither I, nor any of the attorneys, even observed Mr. Calabrese, Sr. making his remark.

Moreover, while Mr. Mannie's co-defendant physically attacked his attorneys in open court, it is not even clear whether Mr. Calabrese, Sr. intended his remark as an actual threat. While the juror reported that Mr. Calabrese, Sr. said "you're dead" or "you are a fucking dead man," it is at least possible that this was a mere expression of frustration as opposed to an actual threat—the fact that Mr. Funk did not even observe Mr. Calabrese, Sr. utter the remark enhances the possibility that Mr. Calabrese, Sr. was emoting as opposed to actually delivering a threat.

I assume, though, for purposes here, that the jurors who observed the remark did perceive it as a threat against Mr. Funk. Even so assuming, however, this incident still fails to cross the threshold the Seventh Circuit set forth in *Mannie*.

In addition, many of the reasons I reject Defendant's severance arguments apply with equal force here. The nub of Co-Defendants' argument is that they were so tainted by Mr. Calabrese, Sr.'s outbursts that the jurors were unable to give them separate or fair consideration. Circumstances throughout the trial, however, served to differentiate the Defendants from one another. I reiterate the Defendants all looked different than one another, they had distinct mannerisms, they all carried themselves differently in the courtroom, they each sat at different tables, they were represented by different lawyers, three of the five Defendants testified (all quite distinctly), etc. In addition, the defense lawyers and I reminded the jurors throughout the proceedings that each of the defendants were entitled to separate consideration. The more co-defendants are differentiated from one another—and I believe that in this case the jury viewed each Defendant separately—the less likely it is that the jury will paint co-defendants with one brush or fail to give each separate consideration. Accordingly, the fact that Co-Defendants were differentiated from Mr. Calabrese, Sr. vastly diminishes any possibility that the jurors would attribute Mr. Calabrese, Sr.'s behavior to Co-Defendants.

As I noted in the severance section, *see supra* Section II-B, the fact that the jury returned mixed verdicts in the second phase of the trial is a powerful indicator that the jurors were able to give separate consideration to each Defendant. Co-Defendants' argument rests on one of two propositions, either (a) the jury was unable to differentiate between the various Defendants and so taint on Mr. Calabrese, Sr. (assuming it existed) was imputed to Co-Defendants; or (b) witnessing the threat filled the jurors with fear that affected their verdict. The verdicts in the second phase of the proceedings undermine both of these premises.

As for the first proposition, the distinctiveness of the Defendants, coupled with the split verdicts in the second phase, undermine the argument that the jury was unable to differentiate

13

between the various Defendants.  As for the second proposition, one would expect that if the jury was so possessed by fear that it was unable to render fair verdicts, it would have either given all acquittals (so as not to anger the Defendants), or all convictions (in order to ensure that the Defendants were locked away in prison).  While the jury did return all guilty verdicts in the first phase, it did not find all of the Defendants responsible for all of the murders charged.  The fact that the jury determined that some of the defendants were responsible for committing some of the murders, while failing to agree on some of the others, indicates that (1) the jurors did give separate and due consideration to each of the questions it confronted; and (2) that it was not so paralyzed by fear that it was going to blindly return all guilty verdicts.

Certainly, there comes a point where antics at trial get so out of hand that the entire process deteriorates and no defendant receives a fair trial.  The Seventh Circuit held that such a point was reached in *Mannie*; I find that it was not reached here.

### D.  Pre-Trial Publicity

Throughout the proceedings, and again in these post-trial motions, several Defendants complained about pre-trial and trial publicity.  Without question, there was a great deal of public interest in these proceedings.  Moreover, the news media did regularly report on the case in the days leading up to—as well as throughout—the trial.

None of the publicity that surrounded this trial affected the Defendants' fundamental rights or deprived them of a fair trial.  First, I repeatedly instructed the jurors to ignore anything connected to the case in the media.  I have no reason to believe that the jury disobeyed that directive.

Furthermore, nothing in the press was more inflammatory or prejudicial than the allegations the Government made directly in the courtroom.  The foundation of our nation's

criminal justice system rests on the understanding that jurors can differentiate between an allegation and proof beyond a reasonable doubt. The fact that the comments in the public ether were similar in nature to the allegations the Government presented—coupled with the idea that jurors can separate allegations from admissible evidence—underscores the conclusion that the Defendants have not been prejudiced.

At bottom, I conclude that the jurors followed my instructions, thus Defendants were not prejudiced. Even assuming that the jurors disregarded my instructions and consumed some media coverage of the trial, I decline to conclude that this would have deprived Defendants of a fair trial.

E.      *Anonymous Jury*

Defendants complain about the fact that I empaneled an anonymous jury. However, the arguments Defendants make now do not differ materially from the arguments they made when I granted the Government's motion for an anonymous jury before the trial commenced. The Seventh Circuit has approved the use of an anonymous jury in instances, like the case here, where revealing jurors' names could subject jurors to influence, either through bribes or intimidation. *See United States v. DiDomenico*, 78 F.3d 294, 301-02 (7th Cir. 1996).

When considering this motion in advance of trial, I balanced Defendants' interest in preserving the presumption of innocence and in conducting a useful *voir dire*, against the jurors' interest in their own security and the public's interest in having a jury assess Defendants' guilt or innocence impartially. *See United States v. Amuso*, 21 F.3d 1251, 1264 (2d Cir. 1994). I considered Defendants' involvement in organized crime; the fact that there were allegations that some of the Defendants had attempted to interfere with the judicial process; the fact that Defendants potentially faced severe penalties if convicted; and the fact that—in light of recent

15

high-profile trials in this building—it was nearly certain that the jurors' names would have become public, thus potentially exposing them to intimidation or harassment. *See United States v. Sanchez*, 74 F.3d 562, 564 (5th Cir. 1996).

Ultimately, in light of the background of these particular Defendants, the character of the organization to which they were alleged (and later found) to have belonged, and the nature of some of the specific allegations of efforts to obstruct the judicial process—often through violence—I determined that empaneling an anonymous jury was appropriate here. I believe that the publicity that ultimately surrounded the trial, and the news media's dogged pursuit of information regarding the jurors, *see United States v. Calabrese*, 515 F. Supp. 2d 880 (N.D. Ill. 2007) vindicates that decision.[6]

### F. Bill of Particulars

Several Defendants argue that I erred by failing to require the Government to file a bill of particulars. A request for a bill of particulars should be granted if the "indictment [fails to] set[ ] forth the elements of the offense charged and sufficiently apprise [ ] the defendant of the charges to enable him to prepare for trial." *United States v. Fassnacht*, 332 F.3d 440, 447 (7th Cir. 2003) (*quoting United States v. Kendall*, 665 F.2d 126, 134 (7th Cir. 1981)). When I denied the motion

---

[6]Defendant Lombardo argued that I exacerbated the problem by denying several of his requests throughout the jury selection process (striking some the questions he proposed for the jury questionnaire, refusing to ask certain follow-up questions, limiting the number of peremptory challenges, denying the motion for appointment of a jury consultant, denying certain motions to dismiss jurors for cause). Mr. Lombardo also asserts that I conducted some of the jury selection process outside the presence of the Defendants without their having waived the right to be present. I note, however, that no Defendant requested, through counsel, the right to be present at any part of the jury selection process. Mr. Lombardo fails to identify which questions I should have included. Nevertheless, I adhere to my rulings.

for a bill of particulars before the trial commenced, I was satisfied that the necessary information was available from the lengthy indictment. I remain satisfied of that today.

G. *Pre-Trial Delay*

Mr. Lombardo argues that the Government's delay in bringing these charges violated his due process rights. I note first that the statute of limitations for a particular crime generally serves as a safeguard for defendants against unreasonable prosecutorial delay. *United States v. McMutuary*, 217 F.3d 477, 481 (7th Cir. 2000). Further, Mr. Lombardo has failed to demonstrate that the delay caused actual and substantial prejudice with the requisite facts that are specific, concrete, and supported by evidence. *See United States v. Henderson*, 337 F.3d 914, 920 (7th Cir. 2003). Even if he had done so, though, the Government asserts that the delay was for investigative purposes, and there is nothing to suggest that the Government delayed in order to gain a tactical advantage or for some other impermissible purpose. *See id.*

H. *Alleged Prosecutorial Misconduct*

Mr. Schiro urges me to grant him a new trial in light of supposed prosecutorial misconduct. Specifically, he argues that Mr. Funk mischaracterized the evidence during his closing argument. It is true, as the Government concedes, that Mr. Funk did misstate some of the evidence in his closing argument. Thereafter, however, Mr. Schiro made a motion for a mistrial; I denied that motion; Mr. Funk proceeded to point out his misstatement to the jury and urge the jury to disregard the misstatement; and Mr. Mars, in his rebuttal argument, again pointed out the mistake. This is in addition to the instructions I gave to the jury about what is, and what is not evidence; the Government's admonition to the jury that its argument was not evidence; and Mr. Schiro's attorney's closing argument, in which he highlighted the fact that Mr. Funk had made a misstatement.

Mr. Schiro had failed to demonstrate sufficient prejudice when I denied his motion during trial. Following my denial, moreover, Mr. Funk, Mr. Schiro's attorney, and Mr. Mars all drew the jury's attention to the error. Under these circumstances, Mr. Funk's misstatements simply fail to warrant the relief Mr. Schiro now seeks.

I.     *Jury Issues*

Several Defendants argue that they are entitled to a new trial due to issues surrounding the jury. There are a few sub-issues here, I will deal with them in turn.

### 1. <u>Excusal of Juror</u>

I excused one of the jurors during trial because it had become clear that she was extraordinarily uncomfortable with her service. Soon after the jury was empaneled, one of the jurors expressed unease to the jury administrator. The jury administrator advised the juror that if she had a problem or concern, that she ought to send a note to the judge. The jury administrator informed me of this conversation. Nothing else happened in the ensuing six or seven weeks, but I observed the juror, and determined that her idiosyncratic behavior betrayed some continuing discomfort. The juror in question had sat in the same seat—the one furthest from the well of the courtroom—for weeks in a row. Moreover her demeanor in the courtroom—her body language upon entering and exiting the courtroom, her posture in her chair, etc.—revealed at best discomfort and perhaps anxiety or panic. In addition, the court security officer assigned to the case informed me that she was behaving curiously in the jury room, in part by disassociating herself from all the other jurors and by insisting on a certain position in line so as to be guaranteed her desired seat.

As a result of the earlier comment relayed to me from the jury administrator, the statement from the court security officer, and the demeanor I observed in the courtroom, I elected

to speak with her—in my law clerk's presence—to ensure that everything was all right. I told her that I was following up because I had heard about her earlier comment to the jury administrator. She suggested that everything was alright, but also expressed hope that the trial was almost over. As we concluded our conversation, she got up to leave and stopped to ask me whether any threats had been made against her. I assured her, unequivocally, that none had. At that point, I concluded that I would not permit her to sit on the jury. As I was contemplating when to excuse her, I received a message, via the court security officer, that she wanted to speak to me. She informed me that she didn't want to serve any longer, and when I inquired as to why, she said that she just felt uncomfortable. I gave her an opportunity to expand upon that, but she declined. I asked her if she'd discussed her discomfort with any of her fellow jurors, and she replied that she had not (not surprising, in light of the earlier report from the court security officer that she tended to avoid interacting with other jurors). I gave her the option of leaving then, or waiting until the end of the day, and she chose to be let go at that point, so I acquiesced.

Within minutes after excusing the juror, I informed counsel for the parties of what had occurred. At the time I informed them that I had excused her, no one objected to her excusal and no one sought a *voir dire*. The only reaction from the attorneys was interest in what the excused juror's juror number was (we, of course, supplied that information).

Later that same day, counsel for one of the defendants asked for additional details about the excusal. I recounted the details surrounding her excusal in roughly the same fashion as set forth above. Again, no one objected to her excusal and no one sought a *voir dire*.

The next day, counsel for Mr. Calabrese, Sr. did make a motion for mistrial. At my urging, he and other defense lawyers reserved their objections for the end of the trial. Again, no one asked me to conduct a *voir dire*. It would have been a simple matter, either on the day of her

dismissal or thereafter, to conduct a *voir dire*, yet one was not sought. Defendants in this case were represented by experienced and able defense counsel. I believe that, for good and sound tactical reasons, these attorneys were not upset to see this particular juror—who was set to be an alternate at the time she was excused—leave the jury. Nevertheless, based on my observation of the juror in the courtroom and the conversations I had with her in my chambers, I adhere to my conclusion that she was not fit to serve on this jury and my decision to excuse her.

## 2. **Improper Influence of the Jury**

Defendants also argue that I had an "intimate relationship" with the jury, as exemplified "by the 'birthday card' the jury sent to the Court, and the fact that the Court arranged for attorneys to represent jurors whose rights or interests, if any were directly related to their service as jurors." Defendants take all this, add the fact that "the objection-ruling scorecard overwhelmingly favored the government," and infer that the jury may have delivered a guilty verdict in order to please the trial judge.

I reject this argument. The predicate for the argument relies on a skewed perception of the facts, and the resulting inference is faulty. First, I did not have an "intimate" relationship with the jury. While defense counsel suggests that the jury got a birthday card for me, that is not, in fact, what happened. There was a break in the trial schedule one afternoon because there was a ceremony for a newly-sworn-in district judge, the Honorable Frederick Kapala, taking place in the courtroom we used for the trial. The jurors were informed of the reason for the break in the trial schedule, and in response, they got a card *for Judge Kapala*, congratulating him and welcoming him to the bench. To cite this as indicative of an intimate relationship with me totally misunderstands the nature of the event. If the card suggests anything, it is that some of the jurors had a quirky sense of humor.

I did arrange for counsel for two jurors who had issues with their employers related to their jury service. I dd so pursuant to 28 U.S.C.A. § 1875(d)(1). These arrangements were made in private, outside of the presence of the remaining jurors, and the affected jurors were instructed not to discuss the issues with their fellow jurors. The suggestion that these arrangements somehow led to an "intimate" relationship between the jurors and me is erroneous.

Furthermore, even if one were to (wrongly) concede that the jury did have an "intimate" relationship with me, the inference that Defendants draw—that the jurors delivered a guilty verdict because of some belief that that is what I preferred—is also faulty. I specifically instructed the jury that "nothing I said or did during the trial is meant to indicate any opinion on my part about what the facts are or about what your verdict should be." I also instructed the jurors that the attorneys have the right to object and that they should infer nothing, either from the objection, or from any of my rulings I made thereon. In sum, I neither had an "intimate" relationship with the jury, nor was there any basis upon which the jurors could have concluded that returning a guilty verdict would please me in any way.

### 3. "Juror Misconduct"

Defendants argue that I should have granted their motion for mistrial after the Court received a note from a juror indicating that some members of the jury had formed opinions about the outcome of the case before hearing all of the evidence.

The note, received before closing arguments were set to commence, said that "[t]here are a little over a handful of the jurors that have formed an opinion before hearing all closing statements . . . ." The note also stated that "[s]ome [jurors] also mentioned that they would be very upset if they had to deliberate for more than a few days, while waiting on a decision that should already be made or close to being known."

Of course, just because a juror alleges that something took place, does not necessarily mean that it did. Nevertheless, the note raised potentially serious questions, so I decided to *voir dire* each juror individually. After conducting the *voir dire*, I concluded that the jury was not tainted, and that a mistrial was not warranted. During my interviews with the jurors, I listened closely to their answers to my questions, paid careful attention to their demeanor, and observed their body language and posture. I determined—out of an abundance of caution—to remove two jurors. I was satisfied, though, that the rest of the jurors had preserved the presumption of innocence and could fairly and truly deliberate.

The close question was not whether or not to grant a mistrial, but whether to disqualify the two jurors. In the end, I decided that the best practice was to exclude them, despite the substantial likelihood that they too could deliberate fairly. No counsel objected to their excusal.

J.       *Break In Deliberations*

Defendants argue that they were prejudiced by the fact that there was a break during the second phase of jury deliberations. The break occurred after the jury had rendered guilty verdicts in the first phase of the trial. It occurred while the jurors were considering whether the Defendants would be held responsible for the various murders charged in the indictment.

Defendants fail to explain how this break may have prejudiced them. First, I instructed the jurors throughout the trial and their deliberations to avoid media coverage of the trial, I assume that that instruction was followed, even during the break. The result of the second phase suggests a lack of prejudice. While there were straight guilty verdicts during the first phase, the second phase resulted in a more mixed result, with the jurors finding some defendants liable for some murders, yet deadlocking on others. Because Defendants fail to demonstrate how the break may have prejudiced them, this fails to serve as a basis upon which to grant a new trial.

*K.*     *Right To Be Present*

Throughout their motions, Defendants argue that they were at times absent from certain portions of the proceedings without waiving their right to be present.  *See, e.g., supra* at 16, note 6.  However, at no time did I deny any Defendant's request (through counsel or otherwise) to be present for any stage of the proceedings.  There are three decisions that defendants always get to make for themselves: (1) how to plead; (2) whether or not to waive the right to trial by jury; and (3) whether or not to take the witness stand.  Other decisions, including whether or not to be present for certain parts of the proceedings, can be considered general trial strategy.  Moreover, most of the instances about which Defendants now complain were proceedings at sidebar.  Customarily, defendants do not seek to be present at proceedings at sidebar, and Defendants here did not request to be present.  Nevertheless, in the one or two instances in which I can recall defendants seeking to be present, I granted those requests.  Had Defendants here sought to be present, I'm certain that I would have granted their request.

*L.*     *Prior Rulings*

Defendants raise a number of other issues in their respective motions for a new trial. They all pertain to issues that arose before or during trial, upon which I heard argument from both sides, and upon which I rendered a judgment.  I adhere to my previous rulings and conclude that none of these issues warrant the granting of a motion for a new trial.

### III.    <u>CONCLUSION</u>

For the above stated reasons, Defendants' motions for judgment of acquittal or a new trial

are DENIED.

ENTER:

James B. Zagel
United States District Judge

DATE:  September 10, 2008